IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

PATRICIA CLARK                                              PLAINTIFF

    v.               Case No. 05-1035

HARTFORD LIFE AND
ACCIDENT INSURANCE CO.                                      DEFENDANT

## MEMORANDUM OPINION & ORDER

This disability benefit claim is before the Court for decision on the stipulated administrative record (Doc. 8) and the briefs of the parties (Docs. 10 & 13). Plaintiff brings this action pursuant to the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, alleging Defendant's decision to discontinue her benefits and deny her appeal for long-term disability benefits was unreasonable and not supported by substantial evidence. For the reasons stated below, the Court finds that Defendant's decision to terminate long-term disability benefits should be **REVERSED** and in addition, Plaintiff is awarded reasonable attorneys' fees and costs.

## Factual Background

The following facts are drawn from the Administrative Record and are undisputed. Plaintiff worked for Wal-Mart as a stocker from 1988 to 1994. She was insured by the Hartford Life and Accident Insurance Company under the Hartford Life and

Accident Group Policy (#GLT205212)("policy"), the group policy of Wal-Mart Stores, Inc. As a stocker, Clark was required to lift or move objects weighing up to 80 pounds. (AR 267-70). Because of medical problems, her last day of work was March 7, 1994.

Clark has a long history of medical problems, reaching back to 1994. Initially Clark was diagnosed with occipital neuralgia[1], brachial neuritis[2], migraine headaches, and pain in the neck, head, shoulders and arms. (AR 853-54). Over the next several months, Clark underwent pain management treatment, including prescriptions for Imitrex and Mexitil, and Phenergan, along with periodic cervical facet injections and occipital nerve blocks. (AR 726-728). Dr. Lyon, the attending physician, confirmed that these measures provided only temporary relief and that Clark was totally disabled by the intense pain associated with her condition. (AR 803 & 852). Clark was notified by letter that she was approved for long-term

---

[1] "Occipital Neuralgia", or "Posttraumatic Neck Syndrome", is a clinical complex of pain, tenderness, tight neck musculature, vasomotor instability, and ill-defined symptoms such as dizziness and blurred vision as the result of trauma to the neck. *See PDR Medical Dictionary* 1267 (1st ed. 1995).

[2] "Brachial neuritis", or "Brachial Plexus Neuropathy", or "Neuralgic Amyotrophy", is a neurological disorder, of unknown cause, characterized by the sudden onset of severe pain, usually about the shoulder and often beginning at night, soon followed by weakness and wasting of various forequarter muscles, particular shoulder girdle muscles. *See PDR Medical Dictionary* 1267 (1st ed. 1995).

disability benefits. (AR 799). This letter explained that Clark would receive benefits for the next 12 months so long as she remained disabled from her own occupation. Thereafter, according to the letter, Clark would receive benefits only if she were totally disabled from performing "any occupation" for which she was qualified by education, training or experience.

Hartford continued to monitor Clark's condition through periodic reports from Dr. Lyon. A Physical Capacities Evaluation (PCE) form completed by Dr. Lyon in January 1995 reflected that Clark should be able to sit for four hours each day, stand three hours a day, and walk and drive two hours each day. Her diagnosis remained occipital neuralgia and persistent brachial nueritis. (AR 795-596). She also continued to undergo cervical facet injections and occipital nerve blocks. (AR 718-720).

In July 1995, Hartford notified Clark that it would begin to evaluate her case for continued benefits under the "any occupation" standard. (AR 765). Dr. Lyon submitted a statement of continued disability, again citing persistent brachial neuritis and occipital neuralgia. (AR 746-47). A report to Hartford from another treating physician, Dr. Donna Holder, reported treatment for intractable headaches, intractable neck pain, occipital neuralgia, cervical facet arthropathy and myofascial pain syndrome. (AR 701). Clark continued to receive

3

trigger point injections and facet blocks. Dr. Holder stated that Clark's pain prohibited her from prolonged use of her neck, even in a seated position.

In February 1996, Clark was approved for Social Security disability benefits based on her head, neck and elbow conditions. In May 1996, Dr. Lyon submitted a physician's statement that indicated continued disability, and cited right arm pain and numbness in Clark's face. (AR 616-17).

By December 1998, Dr. Lyon's statement regarding continuing disability reflected a diagnosis of fibromyalgia and neck pain. The only other treating physician noted in the statement was Dr. Richard Nichols, who had performed Clark's elbow surgery. (AR 610-11). Medical records from Dr. Lyon indicated that Clark was receiving right occipital ridge injections of Xylocaine and Celestone. Clark's prescriptions at that time included Zoloft, Klonopin, Prilosec, Vistaril, Vicodin and Nubain. (AR 574).

Dr. Lyon continued his course of treatment for several years, periodically submitting an updated PCE. By December 2001, the restrictions Dr. Lyon listed were "no standing for more than 15 to 30 minutes, walking for only short distances, no sitting for more than an hour without getting up, no lifting or carrying anything over five pounds, no overhead reaching or working, and no use of keyboards or repetitive hand motions."

4

(AR 595-96, 598-99). He stated these restrictions would last through Clark's lifetime.

Dr. Lyon's statement in support of disability dated March 20, 2002, included a primary diagnosis of fibromyalgia. He noted multiple areas of tenderness consistent with fibromyalgia, and indicated that Clark was restricted in sitting for one to two hours before changing position to alleviate pain. (AR 555-56). As for keyboard use and repetitive hand motion, Dr. Lyon limited his patient to one to two hours without having to change posturing.

Clark suffered a fall early in 2002 and began treatment with Dr. Timothy Spires. (AR 524). Dr. Spires' office notes indicated lumbar spine strain and coccygodynia. By May 2002, Dr. Spires' diagnosis was lumbar radiculopathy. An MRI showed central disc herniation at L4-5 level, extending inferiorly with bilateral L5 nerve root encroachment. (AR 318).

In June 2002, Clark began receiving treatment from Dr. Ronald Ellis who performed a series of lumbar epidural steroid injections. (AR 517-18, 485-86). In July 2002, Dr. Ellis performed diagnostic provocative discography, noting a markedly degenerative disc with fissuring interiorly, posteriorly and bilaterally. (AR 479-480).

In early 2003, Hartford exercised its right to have the medical records reviewed by another party. It selected the

5

Medical Advisory Group to handle the review, and the Group assigned Dr. Gaetjens to review and evaluate Clark's records. (AR 452-458). Gaetjens reviewed medical records and spoke with Dr. Spires, Dr. Ellis and Dr. Lyon. Dr. Ellis reported to Gaetjens that Clark's back condition had improved but he could not discuss sedentary work for Clark because a functional capacity examination had not been administered. Dr. Ellis also mentioned that Clark was suffering from fibromyalgia, obesity and deconditioning. Dr. Spires reported to Gaetjens that he could not comment on Clark's capacity for sedentary work because of ongoing pain in both legs and continued use of narcotics. (AR 456). Dr. Lyon reported to Gaetjens that he had injected Clark's occipital for occipital neuralgia and that her primary impairment was fibromyalgia and her emotional status. (AR 455). Dr. Lyon further indicated that Clark was not able to function in the work environment because of fibromyalgia and her emotional status, and "would never again function in the work environment." (AR 456). As a result, in March 2003, Gaetjens produced a report that stated Clark retained the capacity for full-time sedentary work. (AR 458).

By March 2004, Clark changed her primary treating physician from Dr. Lyon to Dr. Daniel Trejo. Dr. Lyon reported that he could not give additional information about the patient to Hartford. (AR 74). Dr. Trejo noted in his initial

examination that Clark was suffering from anxiety and reported a history of fibromyalgia, bad nerves and elbow and neck surgery. (AR 283-84). In a followup visit in April 2004, Dr. Trejo noted that his patient had a good mood, normal amount of energy and his impression was mild depression so he continued a prescription for Paxil CR, with a return date set for three months. (AR 282). Dr. Trejo gave Clark steroid shots for back pain and continued to monitor her anxiety. (AR 280).

Hartford contacted Dr. Trejo by letter of June 1, 2004, and sought the new physician's assessment of Clark's restrictions and limitations. (AR 265). Dr. Trejo was asked whether he agreed with the restrictions provided by Hartford on a pre-printed form. He returned that form with a checkmark indicating his agreement with the restrictions and limitations. (AR 265, 72). Contained in the "Summary Detail Report" provided by Hartford is an entry on 08/08/2004 which states that Dr. Trejo "agreed claimant able to perform sedentary work." (AR 72).

Hartford obtained an employability analysis based on those restrictions. One occupation identified, with a "good" level of transferability, was that of telephone solicitor. Two other potential sedentary occupations were eliminated because they exceeded Clark's restrictions, declined in the national economy, or required skills Clark had not demonstrated in her

7

prior work. (AR 251-52).

Clark was informed that she no longer qualified for total disability on September 1, 2004. Shortly thereafter, Dr. Trejo directed correspondence to Hartford providing that he was reversing his initial approval of the restrictions and limitations on which the termination decision was based.

By letter of October 5, 2004, Clark sought to appeal the termination of her benefits. (AR 240). She advised Hartford that Dr. Trejo would be sending a letter to explain why she could not work in any occupation. When this letter arrived, it stated that Clark had "comorbid diagnoses" that included hypertension, chronic back pain and fibromyalgia which rendered her disabled due to chronic pain. (AR 234). Dr. Trejo stated that he had been giving Clark monthly trigger point injections and added that Clark had been in a serious motor vehicle accident in July of 2003 causing her increased back pain. Dr. Trejo asked Hartford to reconsider its determination, which resulted in no response.

Hartford again exercised its right to have a third party review the records. It referred its files to Dr. Barry Turner, a physician with the University Disability Consortium. Hired by Hartford, Dr. Turner produced a report from his review of the records and surmised that Clark's diagnosis was possible fibromyalgia with no positive objective findings. (AR 174-77).

8

He noted that Dr. Spires reported adequate recovery from shoulder surgery, but not to the point where she could return to work. (AR 175). Turner stated he had a phone conversation with Dr. Trejo regarding Clark's emotional and psychological state and her possible return to work. According to Turner's report, Dr. Trejo indicated that Clark had several trigger points that he was injecting as well as psychological overlay that compounded her problems. (AR 175). Turner also reported a similar conversation with Dr. Spires.

Turner concluded that Clark was capable of full-time sedentary work if she could change positions "at will." Turner wrote both Dr. Spires and Dr. Trejo to confirm his version of their telephone conversations, and stated that his summary would be presumed correct if they did not respond within one week. (AR 197 & 199). Neither responded and Hartford relied upon this as dispositive; i.e. a lack of an affirmative answer by two treating physicians to indicate a reversal of their diagnoses of Clark.

Hartford sought clarification from Dr. Turner regarding any restrictions that Clark would have if she could change positions "at will." Turner explained that Clark would need to be allowed to stand up and move around at will, alternate sitting and standing at will, and walk and stretch for five minutes every half hour to avoid stiffness and soreness. (AR

9

201). Hartford informed Clark of its decision to uphold her termination, by letter of December 9, 2004. (AR 183-85). Acknowledging that Dr. Trejo had stated in a letter that Clark was "totally disabled," Hartford Appeals Specialist Amy Boys explained that this type of declaration was not sufficient in the absence of restrictions and limitations that should be disabling to the patient.

Hartford assumed all of Clark's doctors agreed with the restrictions and limitations previously cited, and an employability analysis reflected that sedentary work was available within those restrictions. The denial was upheld. Hartford never sought to have Dr. Trejo provide the restrictions and limitations for Clark. The Plaintiff exhausted her administrative remedies and filed this action.

**Discussion**

Under ERISA, a denial of benefits by a plan administrator must be reviewed *de novo* unless the benefit plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan, in which case the administrator's decision is reviewed for an abuse of discretion. *Woo v. Deluxe Corp.*, 144 F.3d 1157, 1160 (8th Cir. 1998) *citing Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Accordingly, the Court must look to the language of the plan at issue to determine the proper standard

10

of review.

The Parties agree the Plan provides for discretion to be exercised by Hartford under the express language of the Plan. (AR 62). However, Clark argues that a sliding-scale standard should be utilized by this Court. The sliding-scale approach is only proper when it can be shown that decisions of the plan administrator were influenced by a conflict of interest or serious procedural irregularity which caused a breach of the plan administrator's fiduciary duty [to claimant]. *Woo*, 144 F.3d at 1161. Clark contends that Hartford relied heavily upon its non-treating doctor's attempt to modify the position of the treating physicians, and consequently that reliance illustrates Hartford's conflict of interest. The Court does not find this persuasive, nor are any procedural irregularities found in the record. Hartford's decision will therefore be reviewed for an abuse of discretion.

The Eighth Circuit has "variously defined an interpretation that would be an abuse of discretion as being 'extremely unreasonable,' 'virtually' the same as arbitrary and capricious, and 'extraordinarily imprudent.'" *Shell v. Amalgamated Cotton Garment*, 43 F.3d 364, 366 (8th Cir. 1994) (citations omitted). "The proper inquiry into the deferential standard is whether 'the plan administrator's decision was reasonable; i.e., supported by substantial evidence.'" *Cash v.*

*Wal-Mart Group Health Plan,* 107 F.3d 637, 641 (8th Cir. 1997) (quoting *Donaho v. FMC Corp.*, 74 F.3d 894, 899 (8th Cir. 1996)). While the word "reasonable" possesses numerous connotations, "this court has rejected any such definition that would permit a reviewing court to reject a discretionary trustee decision with which the court simply disagrees[.]" *Id.* at 641 (citation omitted).

A decision is reasonable if "a reasonable person could have reached a similar decision, given the evidence before him, not that a reasonable person would have reached that decision." *Cash*, 107 F.3d at 640. If the decision is supported by a reasonable explanation, it should not be disturbed, even though a different reasonable interpretation could have been made." *Id.* (citation omitted). Where there is a conflict of opinion between a claimant's treating physicians and the plan administrator's reviewing physicians, the plan administrator has discretion to find that the employee is not disabled unless "the administrative decision lacks support in the record, or ... the evidence in support of the decision does not ring true and is ... overwhelmed by contrary evidence." *Donaho*, 74 F.3d at 901 (8th Cir. 1996).

The issue before this Court is whether the Plan Administrator ignored the great weight of the evidence when it terminated Clark's Long Term Disability benefits. Hartford's

decision to remove Clark from total disability hinged on the checkmark returned to Hartford from Dr. Trejo indicating that he agreed with Hartford's interpretation of Clark's restrictions and limitations. Hartford provided the language of the restrictions and only asked Dr. Trejo whether he agreed or did not agree. Previously the treating physicians were asked to provide Clark's condition on forms containing blank sections asking for particular information and boxes to check. (AR 555 & 616). Hartford combined some of the restrictions and limitations from previous doctors and asked "would you agree with the following limitations and restrictions for Ms. Clark." (Page 9, Doc 13)(AR 265). Whether or not that led Dr. Trejo to change his initial response the Court cannot be sure, but it is clear that in Dr. Trejo's opinion, Clark was not able to work.

Dr. Trejo first answered Hartford's pre-printed letter by marking he agreed with the restrictions. (AR 265). Shortly thereafter, Clark received notice from Hartford that she no longer qualified as totally disabled under the policy. (AR 245). Immediately, Dr. Trejo contacted Hartford by fax to indicate that Clark was still totally disabled and could not perform full-time sedentary work. (AR 243). Next, Dr. Trejo delivered a different copy of the letter and marked that he did not agree with the restrictions for Clark. He followed with a letter describing why he believed Clark was totally disabled.

13

(AR 242). The letter stated that Clark suffered from "Co-morbid Diagnosis which include Hypertension, Chronic Back Pain and Fibromyalgia which have permanently disabled her due to the chronic pain in several areas of her body." The letter further provided that Clark had recently began receiving injection treatments of trigger points on a monthly basis. Finally the letter stated that Dr. Trejo believed the July 13, 2003 motor vehicle accident had led to "increased chronic back pain." Although it may have been within the discretion of Hartford to give less weight to the changed opinion of Dr. Trejo, his statements should have merited some consideration. Dr. Trejo did not state any new or different diagnosis, he only sought to clarify his position.

According to Hartford's Summary Detail Report, Valarie Stroud noted that Dr. Trejo "agreed claimant able to perform sedentary work." (AR 72 - see the 08/08/04 entry). Apparently this was her interpretation of the original letter faxed back to Hartford by Dr. Trejo. On the 10/04/2004 note made by Valerie Stroud, Hartford received a fax from Dr. Trejo indicating that he did not agree with the restrictions and limitations. (AR 68). However, Valerie Stroud stated that there was "no signature page attached to verify if this was completed by AP [attending physician]." Hartford ordinarily does not require signatures to verify that treating physicians

14

have changed their long-standing medical opinions.

Despite statements from the treating physician, Hartford moved ahead with its appeals process. The reviewing doctor, Dr. Turner, never mentions the letter from Dr. Trejo, even though the note made by Amy Boys on 11/08/2004 in the Summary Detail Report indicates that "Dr. Trejo has changed his opinion...will ask UDC physician to contact Dr. Trejo to find out why his position changed." (AR 68). However, Turner's review does note several findings that render the decision to terminate Clark's benefits unreasonable.

Turner indicated that Dr. Spires had always (throughout seven years of treatment) stated that Clark was not capable of sedentary level work. Next, on March 1, 2004, three months after Clark underwent shoulder arthroscopy, Dr. Spires indicated that Clark was having "increased pain in her right shoulder" and "some tenderness there also with trigger point". (AR 194). Turner mentions in his review that "it might be assumed that she had improved significantly," although Turner admits there had not been any follow-up to the March visit where Dr. Spires noted the increase in pain. (AR 195). The record is also void of any contrary medical evidence provided by Hartford to establish any improvement in Clark's condition.

Additionally, Turner found that Clark had a considerable amount of psychological overlay, yet gave no consideration to

15

the effect her psychological problems would have on her employability. A behavioral health case management (BHCM) was considered necessary a year before by Dr. Gaetjens. In his March 7, 2003 report, Dr. Gaetjens found that Clark's impairment from anxiety/depression rendered it "appropriate that a BHCM referral be made to determine the level of its impact upon her functionality." (AR 458). Hartford never completed a BHCM. The final assessment of the 2003 BHCM indicated "there is insufficient psychiatric medical documentation to determine the severity of psychiatric symptoms." (AR 83 & 449).

Overall it appears Hartford failed to properly weigh ten years of pain, diagnoses, surgery and treatment. Hartford failed to consider the opinions of the treating physicians. While Dr. Trejo originally put a checkmark on the request form that Hartford sent, he clearly did not agree with the initial check and it was his ongoing opinion that Clark continued to suffer from various problems. Hartford did not ask Dr. Trejo to elaborate on Clark's condition, as Amy Boys noted should have been done. Instead, Hartford terminated Clark's disability benefits. In the December 9, 2004 letter to Clark, Amy Boys stated that Dr. Trejo's opinion letter stating the Clark was "totally disabled" was the kind of declaration that was "not sufficient in the absence of restrictions and

16

limitations that should be disabling to the patient. (AR 183-85). This is troubling because earlier reports for continued disability provided by treating physicians to Hartford relayed essentially the same information. Specifically, these reports frequently only indicated that Clark was "totally disabled," and did so only by a box being checked. (AR 616 & 746). The Court finds this interpretation of the letter by Hartford arbitrary.

While analyzing the files, Turner considered the sole checkmark of Dr. Trejo to be more probative than Trejo's records and reports. Turner examined the records and made telephone calls. He transmitted letters to Dr. Trejo and Dr. Spires and stated that it would be assumed they agreed with his position regarding Clark's condition. Turner stated that Dr. Spires changed the opinion he had given for years, that Clark could not perform sedentary work at all. (AR 176). These brief phone conversations and the letters to which there was no response, were found to outweigh and contradict nearly a decade of medical findings and treatments provided by Drs. Trejo, Lyon and Spires. Hartford required no signatures, faxes or letters from the treating physicians to verify these radical changes in their medical opinions. Dr. Spires submitted a disability report just a few months prior to Turner's review, in February of 2004, that stated he did not agree with Clark's ability to

17

do sedentary level work, and Dr. Lyon informed Hartford that he could not give additional information about Clark in March of 2004. (AR 74). These facts are so easily controverted, and Turner gave little or no deference to Dr. Trejo who maintained his opinion, that Clark was totally disabled.

Without regard to any change in the opinion of Dr. Trejo, the Court still concludes that a reasonable person could not have found Clark fit for employment with the inapposite facts at bar. Clark has received long-term disability benefits from Hartford under the "any occupation" standard since 1995. The treating physicians all maintained that Clark was disabled and unable to perform sedentary work, and Hartford has provided no evidence to the contrary. Hartford has provided little medical evidence of its own to establish that Clark has improved, and the limited evidence lending itself toward any improvement is overwhelmed by contrary evidence. The record reflects that Clark needs more back surgery, is continuing to receive high levels of medication and spinal injections, is suffering fybromyalgia symptoms, and suffering chronic pain in her back and legs. In 2003, Clark was also involved in an automobile accident and sustained a fall from the steps of her home, further crippling her.

Obviously Clark's condition has not suddenly improved to the point that Hartford could assume such a change in her work

capacity. In the least, a reasonable person could only have found Clark fit for employment after independent medical findings were made through examinations, not merely with letters and phone calls. Accordingly Hartford abused its discretion when it terminated Clark's LTD benefits by ignoring the great weight of the evidence in its findings.

**<u>Attorneys' Fees</u>**

A district court has discretion to award attorneys' fees under ERISA. *See Sheehan v. Guardian Life Ins. Co.,* 372 F.3d 962, 968 (8th Cir. 2004); *Lawrence v. Westerhaus,* 749 F.2d 494, 494 (8th Cir. 1984). "When considering whether to award such fees, the Eighth Circuit has set forth general guidelines for district courts to follow, including the five factors set forth in *Westerhaus*." *Id.* These factors include: (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing parties could deter other persons acting under similar circumstances; (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question [sic] regarding ERISA itself; and (5) the relative merits of the parties' positions. *Westerhaus,* 749 F.2d at 496 (alteration in original); *Sheehan*, 372 F.3d at 968.

Reviewing the relevant considerations, this Court finds that Plaintiff is entitled to fees and costs. First, the decision to terminate Clark's benefits was a clear abuse of discretion because the decision to terminate went against the great weight of the evidence. Second, the record is void as to any information that Defendant would be unable to pay fees and costs. Third, the award in this instance may help deter such abuse of discretion in the future. While none of these factors alone are determinative, when taken together Plaintiff is entitled to reasonable attorneys' fees and costs.

**Conclusion**

For the reasons stated, Defendant's decision to terminate Clark's total disability benefits is REVERSED. Defendant is ordered to pay Plaintiff disability benefits from the date of termination to present, with pre-judgment and post-judgment interest at the rate of 5.02%. Defendant should continue to calculate benefits in the method established under the plan, with Clark's disability benefits being offset by her social security disability benefits. Plaintiff is awarded reasonable attorneys' fees and costs, and directed to present the Court with a proposal for such.

IT IS SO ORDERED this 20th day of September, 2006.

    /s/ Robert T. Dawson
    Honorable Robert T. Dawson
    United States District Judge